[First Nat. Bank of Montg'ry *et al.* v. Acme White Lead & Color Co.]

# First National Bank of Montgomery *et al. v.* Acme White Lead and Color Co.

*Bill in Equity to have Judgment Annulled and Set Aside for Fraud.*

1. *Fraud; collusive suit; when void as against other creditors though debt not fictitious.*—Where, as the result of collusion between a creditor and his insolvent debtor, the creditor brings a suit against the debtor for the purpose of obtaining a judgment by which he was to secure an unlawful preference in the payment of his debts over other creditors of the common debtor; such suit is collusive and fraudulent, and the judgment so obtained is, under the statute, (Code, § 2156), void as against the other creditors of the defendant who may thereby be hindered, delayed or defrauded.

2. *Same; same; same; sufficiency of bill.*—Where a bill filed by a judgment creditor of an insolvent debtor, to have a judgment recovered by another creditor of said debtor annulled, as having been fraudulently obtained, avers that the defendant creditor and the common debtor, who was wholly insolvent, entered into a collusive agreement or scheme by which such creditor, with knowledge of the debtor's insolvency, was to be given a preference over all other creditors, and for the purpose of carrying out such collusive understanding, a suit was instituted by such creditor, after suits by the complainant and other creditors were begun and were pending against the debtor, and the debtor had its attorney to enter an appearance in all the cases pending against it, including that of the complainant, except in the suit by the defendant creditor, and resisted, through its attorney, a judgment by default or *nil dicet* until after a judgment by default had been rendered in favor of the defendant creditor, thereby giving him priority in point of time as to the rendition of judgment and the issuance of a certificate thereof, which was filed in the office of the judge of probate, after the rendition of which judgment in favor of the defendant creditor all opposition or resistance to a recovery of judgment by the complainant and the other creditors was withdrawn, such averments show that the judgment recovered by the defendant creditor was fraudulent and void under the statute (Code, § 2156), as having been suffered

[First Nat. Bank of Montg'ry *et al.* v. Acme White Lead & Color Co.]

by collusion with the insolvent debtor to give such creditor an unlawful preference in the payment of his debt, and make out a case authorizing relief in a court of chancery, in favor of the other creditors of the insolvent debtor.

3. *Same; same; same; same.*—The mere fact that the attorney for the preferred creditor procured the clerk to sign blank summons and complaints, without informing him for what purpose he desired to use them and then filled out such summons and complaints in duplicate and delivered them to the sheriff to be served, with instructions that the originals were to be returned to the attorney and not to the clerk, so as to prevent the case from being placed on the docket, is not, of itself, a sufficient ground for declaring the judgment obtained by such creditor fraudulent against an insolvent debtor's other creditors.

4. *Chancery pleading; relief must be granted in accordance with the averments of the bill.*—Upon the filing of a bill in chancery, the complainant can have no greater relief than the facts alleged in his bill will justify.

APPEAL from the City Court of Montgomery, in Equity.

Heard before the Hon. A. D. SAYRE.

The bill in this case was filed by the appellee on November 16, 1898, against the appellants. The bill averred the following facts, the numbers corresponding to the separate paragraphs of the bill:

(1.) That the Builders & Painters Supply Company was organized in 1891 with a capital stock of $30,000, and has continuously done business since then. (2.) That in July, 1897, the Supply Company became indebted to complainant in the sum of $193.51, which sum is past due and unpaid, and that prior to September, 1897, it was largely indebted to creditors other than the First National Bank of Montgomery in the sum of about $10,000, which is past due and unpaid. (3.) That A. M. Baldwin, one of the subscribers to the stock of the Supply Company was and is an officer and stockholder of the bank; that his sister and her husband were subscribers to the capital stock of the Supply Company, and the latter one of its directors; that the relations between the bank and the Supply Company were very friendly, and it was largely indebted to the bank. (4.) That in September and October the Supply Co. was in-

solvent and much pressed by creditors, and it then became and has ever since been its purpose to prefer the Bank regardless of the rights of other creditors. (5.) That several creditors of the Supply Co. had instituted suits returnable to the November term, 1897, of the circuit court of Montgomery county for the purpose of reducing their claims to judgment, and that the bank and Supply Co. knowing this, devised a scheme for the purpose of giving priority to the bank; that, in order to accomplish this, the bank, through one of its attorneys, a few days prior to the first of November, procured the clerk of the circuit court to sign blank summonses and complaints, without informing him for what purpose he desired to use them, and on the 2d day of November, which was return day, that attorney filled out one of the blank summons and complaints, inserting the bank's name as plaintiff and the Supply Co.'s as defendant, claiming thereby to recover $18,000 with 10 per cent attorney's fee, due by several promissory notes; that $13,500 of this purported to be evidenced by two notes given the first day of November, payable on demand and containing a provision for the payment of ten per cent attorney's fee; that a copy of the summons and complaint was likewise filled out by the attorney of the bank and delivered to the sheriff instead of to the clerk, with instructions privately to serve the copy and return the original to him, the attorney, and not to deliver it to the clerk as he did not wish it placed on the docket of the court; that a few days afterwards the attorney called at the sheriff's office, and found that it had been placed on the docket of the court by the clerk. It is charged on information and belief that the purpose of the attempt to keep the case off the docket was to keep complainant and other creditors of the Supply Co. in ignorance of the bank's suit, so that a preference might be thereby obtained by the bank. (6.) That in furtherance of the scheme to prefer the bank, the Supply Co. had its attorney to enter an appearance in all cases pending against it, which included that of complainant, except in that of the bank, though it had no valid defense to any of them; that complainant and other creditors of the Supply Co. had brought their

suits prior to the bank, and they stood prior on the docket; that when complainant asked for judgment by default on the fourth day of the term, which was default day, the presiding judge called its attention to the fact that an appearance had been entered for the defendant. "That thereupon orator by attorney, stated to the court that there was no pleas on file and that said Supply Co. had no *bona fide* defense and ask for a judgment *nil dicit*: that the attorney of said Supply Co. vigorously resisted motion of orator for judgment *nil dicit,* but upon the presiding judge demanding of said attorney whether said Supply Co. had a *bona fide* defense said attorney stated that he had been advised by Supply Co. to enter an appearance in said suit, but had not been advised of nature of defense; that thereupon orator by its attorney, filed an affidavit setting forth that Supply Co. had no *bona fide* defense to orator's suit, and renewed his motion for a judgment *nil dicit;* that thereupon the presiding judge again called on attorney for Supply Co. to state his defense, to which demand said attorney replied he had not had time to investigate. That orators' attorney then again renewed his motion for a judgment *nil dicit,* which motion was resisted by attorney for Supply Co. on ground that the custom of the court was not to allow judgments *nil dicit,* when an appearance was entered, till day regularly set for trial of the cause; that pending the making of said motion and the drawing up of said affidavit, the presiding judge continued to sound his docket for orders until the case of First National Bank v. Supply Co., above referred to, was called, whereupon the attorney for said bank took a judgment by default against said Supply Co. for amount above stated, and without protest from the attorney of said Supply Co. who was then and there present and who had so vigorously resisted the efforts of orators' attorney to obtain a judgment against said Supply Co.; that soon thereafter, to-wit, thirty minutes thereafter, (the attorney for the bank having meanwhile obtained from clerk of said court a certificate of the judgment just obtained by it against said Supply Co.) the attorney for said Supply Co. arose and stated to the court without any consultation with his client

since he had resisted orator's effort to obtain a judgment, that said Supply Co. had no defense to orator's suit and said attorney had no objection to a judgment by being *then* taken in orator's favor. All of the above proceedings occurred on the same morning; that since the organization of the said Supply Co. till the present day, said Supply Co. has had no other attorney than the one who resisted obtaining of orator's judgment and consented to judgment in favor of said bank, except once when said attorney was out of the city. That immediately after orator had taken its judgment against said Supply Co. it caused a certificate thereof to be issued by clerk of circuit court which was at once taken by orator's attorney to the office of judge of probate of Montgomery county for registration, when said attorney ascertained that the judgment of the bank against said Supply Co. had been already registered." (7.) That the judgment of the bank was for $19,918.63, which amount largely exceeded the real value of all the assets of the Supply Co. (8.) "Orator further charges that said Supply Co. did not at the time said suit was brought against it by said bank, nor does it now, owe said bank anything near the amount for said judgment which said judgment was rendered; that for a long time prior to the bringing of said suit and during the pendency of the proceedings and performances hereinbefore and hereinafter mentioned, and since that time and now, said Supply Co. has regularly accounted to said bank for all moneys taken in by it in the course of trade; that prior to the taking of said judgment by said bank, said Supply Co. had turned over to said bank all its accounts, bills receivable and other choses in action and the same have been collected by said bank in whole or in large part, and the proceeds thereof retained by said bank; and orator further charges that said J. II. Howell, who for a long time prior to the taking of the said judgment by said bank was, and since, and now is, the sole manager of said Supply Co.'s business, is working upon a salary allowed him by said bank, or under an agreement with said bank that he shall receive as compensation for his services certain commissions on sales of the goods of said Supply Co. (9.) That the

giving of the notes for $13,500 was with the understanding between the bank and Supply Co. that suit would be immediately brought and prosecuted without resistance by the Supply Co. which was a part of the scheme to prefer the bank and hinder, delay and defraud other creditors. (10.) That on November 9th, 1897, writs of attachment were sued out in the circuit court against the Supply Co. by Zimmerman & Co. and other creditors in various sums, amounting in all to less than $2,500, which were levied by the sheriff on separate portions of the stock of goods of the Supply Co. and thereupon one of the attorneys for the bank immediately became active and asked the clerk of the circuit court for information as to the grounds of attachment, demanded the names of the sureties on the bonds, inquired of the clerk what information he had of the sufficiency of the bonds, suggested that he had best have them strengthened, and requested that the bonds be given or sent to him for examination. (11.) That there were numerous other claims against the Supply Co. in the hands of attorneys of Montgomery, and fearing that the attachment would be followed by others, and in order to tie up the property and shield it for the bank, the attorney for the Supply Company procured the sheriff to change his levies so as to cover the entire stock of goods of the Supply Company, although it was in value largely in excess of the attachments; that the sheriff declined to do so without being relieved of the liability of suit for damages for excessive levy; that such release was given him, and the levies accordingly changed without the knowledge of the attaching creditors; that immediately a replevy bond was given the sheriff for the forthcoming of the entire stock of goods with A. M. Baldwin and J. H. Howell as sureties thereon, and the Bank then filed in the city court of Montgomery, in equity, a bill wherein it was alleged that the attachments were groundless, and it was sought to have them set aside as fraudulent abuses of the process of court. (12.) That the rendition of judgment in favor of the Bank was in pursuance of an agreement, express or implied, between the Bank and the Supply Company, or their attorneys, to create a preference in favor of the Bank; that that judgment was in effect a judgment suf-

fered by the Supply Company with the intent to hinder, delay and defraud creditors; that the notes given by the Supply Company to the Bank were evidences of debt given by the Supply Company with the intent to hinder, delay and defraud creditors; that the suit on the notes was a suit commenced with the intent to hinder, delay and defraud creditors; that the bill filed by the Bank against the attaching creditors was filed with the connivance and consent of the Supply Company for the benefit of the Bank and in aid of its judgment; and on advice of counsel it is charged that the commencement of said suit and the judgment obtained were fraudulent and void. (13.) That on November 1, 1897, when the notes for $13,500 were given, it was known to the Bank and Supply Company that the latter was insolvent, and that the only way the Bank could receive payment thereon was by obtaining a prior lien on the assets of the Supply Company; that the notes given were without any present consideration passing at that time at the request of the Bank for its sole benefit without any advantage to the Supply Company, notwithstanding which said notes contained a provision for the payment of 10 per cent as attorney's fees, which latter, complainant charges was a fictitious increase of indebtedness by the Supply Company. (14.) That on October 28, 1898, the Bank filed another bill in the city court of Montgomery, in equity, setting forth that it had obtained its judgment, had registered a certificate thereof, and that the judgment was unsatisfied and unpaid; that the Supply Company was insolvent, its stock of goods was involved in litigation; that it had other assets unknown to complainants, and asking for a receiver to take charge of the goods, and apply them to the payment of the Bank's judgment; that A. M. Baldwin was duly appointed receiver without resistance on the part of the Supply Company. (15.) That all the matters hereinabove recited were parts of a scheme to hinder, delay and defraud complainant and other creditors of the Supply Company and all of them fraudulent and void. (16.) The Bank, Supply Company and attaching creditors are made parties defendant to the bill.

The prayer is (1) that the court will retain jurisdiction already assumed over the assets of the Supply Company and extend the receivership to this case; (2) that the judgment in favor of the Bank in the circuit court be declared fraudulent and void; (3) that the Bank be directed to account to the receiver for all assets received by it from the Supply Company since the beginning of its suit in the circuit court; (4) that the assets of the Supply Company in the hands of the receiver be held by him as a trust fund for the benefit of all creditors of the Supply Company; (5) that A. M. Baldwin be removed as receiver.

To this the appellant Bank filed demurrers and a motion to dismiss the bill for want of equity. The principal grounds of the demurrer to the bill as a whole were as follows:   (1.)   It is not alleged or shown by said bill but that the *bona fide* indebtedness of said Supply Company to defendant exceeded the value of all the assets of said Supply Company.   (2.) It is not shown wherein the complainant has been injured by any of the matters and things alleged in said bill.   (3.) It is not alleged or shown that the indebtedness of the said Supply Company to this defendant upon which the judgment of this defendant is based was not *bona fide*.   (4.) It is not alleged or shown that the indebtedness of said Supply Company to this defendant upon which the judgment was based was simulated or fictitious.   (5.) The allegations in said bill that the Supply Company did not at the time of the beginning of said suit against it by said Bank owe said Bank anything near the amount for which said judgment was rendered, are vague, indefinite and uncertain.   (6.) Said bill alleges conclusions of the pleader and does not allege or state facts to show wherein this defendant has done a fraudulent act, or act with intent to hinder, delay or defraud other creditors of said Supply Company.   (7.) Under the allegations of said bill, the manner in which this defendant brought suit against said Supply Company in the circuit court and procured judgment thereon and a certificate thereof, and the filing of said certificate in the office of the probate judge, and the filing of its bill of complaint against the Builders and Painters Supply Company in October,

1898, were proper and lawful. (8.) The preference of a creditor by an insolvent debtor is not unlawful; nor, under the allegations in this bill, has the said Supply Company done more than prefer this defendant as one of its creditors. (9.) The insolvency of a corporation is not sufficient to make its assets a trust fund for the benefit of creditors.

The Bank also separately demurred to the several parts of said bill, whereby it was sought (1) to have its judgment against the Builders & Painters Supply Company declared void; (2) to have the Bank account to the receiver of the Supply Company for money received from that company since its suit was begun in the circuit court, and (3) to have the assets of the company declared a trust fund. The same grounds as assigned to the bill as a whole, and appropriate additional grounds were assigned as grounds of demurrer to the separate portions of the bill. There was also a demurrer to the 8th paragraph on the ground of indefiniteness of its averments.

On the submission of the cause upon the motion and the demurrers the court rendered a decree overruling the demurrers and the motion to dismiss the bill for the want of equity. From this decree the defendants appeal, and assign the rendition thereof as error.

WATTS, TROY & CAFFEY, for appellants.—In determining the equity of a bill, allegations of conclusions will be disregarded, and only appropriate statements of substantive facts will be considered; especially in cases of fraud, even though the allegations of conclusions be proper and necessary, the court will, in its consideration of the bill, look only to the facts stated. For this reason, the allegations that the purpose of the Bank and Supply Company was to hinder, delay and defraud other creditors of the company may be disregarded.—*Loucheim v. Bank*, 98 Ala. 524; *Coal Co. v. Hazzard*, 108 Ala. 222; *Warren v. Hunt*, 114 Ala. 506.

It is alleged that the stockholders and officers of the two corporations and the corporations themselves were on friendly terms. This does not contribute to the strength of complainants' bill. One cannot take advan-

tage of another with whom he is on confidential terms, but a stranger cannot complain that one has favored another with whom he stood on such terms. The relations of the parties are immaterial in this suit. Indeed this court has said it is perfectly natural that a debtor should prefer a creditor who had trusted him, because of confidence arising from intimate relations, over a creditor who is a mere stranger.—*Goetter v. Norman,* 107 Ala. 592-4; *Bank v. Dickinson,* 107 Ala. 270. Mere insolvency does not impress a trust upon the assets of a corporation, and this case is to be determined just as if the Supply Company were a natural person.—*O'Bear Jewelry Co. v. Volfer,* 106 Ala. 205. And it is perfectly legal for an insolvent person to prefer one creditor over another. Under certain circumstances prescribed in the statute preferences will be blotted out where the act amounts to a general assignment; but such a preferance never *per se invalidates* the act or transfer.—*Levy v. Williams,* 79 Ala. 175; *Hodges v. Coleman,* 76 Ala. 119; *Goetter v. Norman,* 107 Ala. 592; 1 Brick. Dig. 128, §§ 75-76; 3 Brick. Dig. 49, § 9, *et seq.; Morrow v. Campbell,* 118 Ala. 330; 3 Amer. & Eng. Encyc. of Law, (2d ed.), 7 and note 3. And an insolvent may transfer all his property in payment of a debt due one person, without being guilty of fraud.—*O'Bear Jewelry Co. v. Volfer,* 106 Ala. 215; *Corey v. Wadsworth,* 99 Ala. 73.

Nor is the nature of the act by which it is said the company sought to prefer the Bank such as to stamp it as fraudulent. The case would certainly have been stronger for complainant in this aspect if the company had *confessed* judgment in favor of the Bank; yet such a confession would have been a lawful method by which to effect a preference; a method which was recognized at common law, and is now permitted under our statute. *Holt v. Bancroft,* 30 Ala. 207; *Bell v. Goetter,* 106 Ala. 462; *Builders & Painters Supply Co. v. Lucas,* 119 Ala. 202.

It is not shown that the debt, the *bona fide* character of which is admitted by not being denied, was not greater than the total assets of the company; much less is it shown that the Bank's claim is fictitious or simulated. For this reason the bill is fatally defective. Complain-

ant could not be hurt if the Bank had a real debt which was sufficient to consume the entire assets of the corporation in its payment by appropriating all of them to itself. It is elementary that fraud, however gross, without injury cannot be made the basis of relief.—*Hodges v. Coleman, supra; Levy v. Williams, supra.* This is the basis of the decision that the intent of the parties is immaterial where a conveyance is made in payment of a debt and the property conveyed is not greater in value than the debt.—*Morrow v. Campbell,* 118 Ala. 330. If hereafter complainant and the creditors other than the bank had brought their suits in the circuit court the Supply Company had conveyed to the Bank all its assets, and it did not appear that they were greater in value than its *bona fide* debt to the bank, such transaction would be unassailable as a fraudulent conveyance.

The result cannot be otherwise when the Bank resorts to the courts and by means of its processes subjects the property of the company to the payment of its debt. If what the parties might have done by mere agreement between themselves would have been lawful, it cannot be unlawful for them to accomplish the same end by court proceedings, even though such proceedings were gone through with by consent. Complainant further contends, however, that aside from the matter of amount and *bona fides* of the debt, the judgment is fraudulent because of the manner in which it was obtained; in other words that its rendition was procured by an abuse of the process of court to such extent as to invalidate it. The learned judge below took this view, and based his decision on *Comer v. Heidelbach,* 109 Ala. 220. We have already shown that the steps taken in bringing the suit and getting the case on the docket and to trial, acquiescence by the insolvent debtor, and his preference of one creditor over others are not only not fraudulent, but lawful and recognized by the decisions of this court. In a race of diligence the Bank has proceeded at every step by lawful means, and has taken no undue advantage of any superior position it may have occupied. The case of *Comer v. Heidelbach* merely reaffirmed the settled doctrine of this court that a creditor cannot, even though his debt is *bona fide*, pursue his debtor by the extraordinary

[First Nat. Bank of Montg'ry *et al.* v. Acme White Lead & Color Co.]

remedy of attachment collusively and without the exist-
ence of a ground therefor.

MARKS & SAYRE, BLAKEY & BLAKEY and LOMAX, CRUM
& WEIL, *contra.*—A debtor will not be permitted to hin-
der or delay his creditors in the pursuit of their legal
remedies however good his intentions; however honest
his motives may be from moral standpoint.   Even if it
be to prevent a sacrifice of his property in order to pay
out more to his creditors, it is still against the law.   A
creditor has a right to the fruit of his diligence and the
law pronounces as *ipso facto* fraudulent every effort on
the part of the debtor to hinder or delay him in the pur-
suit of his legal remedies.   An intent to "hinder and de-
lay" is a fraudulent intent.   A fraudulent intent super-
sedes all inquiry into the consideration.—*Comer v. Heid-
elbach,* 109 Ala. 220; *Seaman v. Nolen,* 68 Ala. 463; *Leh-
man v. Kelly,* 68 Ala. 192; *Sims v. Gaines,* 64 Ala. 392;
*Ala. Nat'l Bank v. Mary Lee Coal Co.,* 108 Ala. 297.   The
averments of the bill in this case were sufficient to show a
fraudulent or collusive agreement between the Bank and
the Supply Company to give the Bank preference in the
payment of its debts.—*Cartwright v. Bamberger,* 90
Ala. 405, s. c. 99 Ala. 262; *Comer v. Heidelbach,* 109 Ala.
230.

It can not be questioned that the suit instituted by the
Bank, with the consent of the Supply Company, and by
a collusive agreement between them, was not a "suit
commenced" within the meaning and intent of section
2156 of the Code.—*Comer v. Heidelbach,* 109 Ala. 220;
*Ala. I. & S. Co. v. McKeever,* 112 Ala. 134; *Ala. Nat.
Bank v. Mary Lee C. & R. Co.,* 108 Ala. 228; *Rice v. Less,*
15 Ala. 298.   While it may be true that a debtor may pre-
fer a creditor, even though the creditor may have
knowledge of the insolvency; yet, if such preference were
given fraudulently, and with intent to hinder, delay and
defraud creditors, it would be void as to them.   A judg-
ment may be obtained for an honest debt, but if ob-
tained for a fraudulent purpose, it is void as against all
those whose rights are offended.—*Hubbard v. Allen,* 59
Ala. 285.   The existence of a fraudulent intent, super-
sedes inquiry into all other questions.—*Bryant v.
Young,* 21 Ala. 264; *Reese v. Skipper,* 94 Ala. 407.

TYSON, J.—The right of the complainants to maintain this bill depends upon whether the facts alleged, without reference to the conclusions averred by the pleader which cannot be taken into consideration, if true, constitute such a fraud upon their rights as creditors of the Supply Company as entitles them to have the judgment lien owned by the Bank upon the property of the Supply Company declared fraudulent and void.

The theory of the bill is that the judgment obtained by the Bank against the Supply Company was the result of a collusive suit in which the judgment assailed was obtained, and that the judgment suffered was alike collusive, and the whole proceeding which resulted in the judgment and the establishment of the lien thereunder had its inception in an express or implied understanding btween the Bank and the insolvent debtor, the Supply Company, by which the Bank was to secure to itself an unlawful preference in the payment of its debt.

There are many facts alleged in the bill, some of them occurring before the rendition of the judgment and some afterwards, which tend very strongly to show that it was the purpose of the Bank and the Supply Company, that the Bank if possible should acquire the first lien upon its property. It is apparent from the allegations that there was a race of diligence engaged in by numerous creditors of the insolvent corporation to secure liens upon its property, some resorting to attachments, and others to suits by summons and complaint. It is also beyond controversy that all these creditors, including the Bank, knew that their common debtor, the Supply Company, was totally insolvent.

No one doubts that a creditor may resort to all lawful means to procure the payment of a *bona fide* debt by an insolvent debtor, even though the result will be to entirely strip the debtor of all available means to pay his other creditors. And this he can do, without having his conduct and the lawful means employed resulting in a preference, declared fraudulent, notwithstanding it may have been the purpose of his debtor to hinder, delay or defraud his other creditors, and notwithstanding the creditor may participate in the intent of

his debtor to hinder, delay or defraud his other creditors, provided his debt is a *bona fide* one and the property conveyed to him in absolute payment of his debt does not exceed in value the amount of such indebtedness. But all this is only true where there is an absolute conveyance by the debtor to his creditor in absolute payment or discharge of his debt. If the result of the attempt on the part of the creditor having a *bona fide* debt, goes beyond the payment of his debt, or if the means employed by him are such as to hinder, delay or defraud other creditors of his insolvent debtor, go beyond those that should be fairly employed by him in procuring the payment of his debt, such as by suit commenced, or judgment suffered by collusion with his insolvent debtor, then the preference thus acquired by him is fraudulent and prohibited by section 2156 of the Code.

This principle was recognized and enforced in the case of *Comer v. Heidelbach,* 109 Ala. 223, where it is said: "It can make no difference that the bill does not aver that the alleged indebtedness of the defendant to the plaintiff in attachment was fictitious or simulated and not *bona fide.* If the plaintiff and the defendant in attachment colluded together for the purpose of transferring the property of the latter, the effort to resort to such judicial machinery, as was said in the case we have just cited [*Cartwright v. Bamberger, Bloom & Co.,* 90 Ala. 405] may be characterized as an 'attempt' to make such fraudulent transfer. It is the collusive and fraudulent use that is attempted to be made of the processes of the court in such cases, so opposed to the whole spirit and policy of the statutes, which the law abhors and denounces. If an attaching creditor fairly and honestly outstrips other creditors in a race of diligence in suing out his attachment, to secure a first lien on an insolvent debtor's effects, liable to attachment, the law upholds his effort and rewards him, in according to him the preference of payment thus acquired. But such a creditor should come into the court with clean hands when he seeks such a right. The law will not sanction a secret, deceitful arrangement and agreement between him and the defendant in attachment, the direct effect

of which is to hinder, delay and defraud his other creditors, by means of which his property is transferred to the attaching creditor, possibly in the interest of the debtor."

It can be of no consequence that the lien acquired by the preferential creditor is by attachment; if the lien is acquired under a judgment, the result of collusion, in fraud of the rights of other creditors, the lien must of necessity be fraudulent. It is the fairness and honesty of the race of diligence engaged in by the creditors in the prosecution of their respective claims to judgment, that secures to the most diligent of them a preferential lien. How can the race be said to be fair, free and entirely honest when the insolvent debtor collusively with one creditor, in order to aid him in securing a first lien, assists him by obstructing others in reducing their debts to judgments by having an attorney appear in order to delay judgments being rendered by default against it on default day so that the Bank, its preferential creditor, might and did get the first lien to which it was not entitled, either in priority in point of time as to suit brought or in priority in point of order in the arrangement of the causes upon the docket? The mere statement of the inquiry avoids the necessity for an answer. To uphold such a preference, would be to require courts of conscience to approve the collusive arrangement of the Bank and its insolvent debtor to the end of hindering, delaying and defrauding the other creditors of the Supply Company; to sanction an advantage obtained by the Bank unfairly and to reward it as the winner of the race of diligence, won by unfair assistance as against its competitors.

We know of no case decided by this court which in the remotest degree militates against the principles quoted above from *Comer v. Heidelbach.* The case of *Warren v. Hunt,* 114 Ala. 506, relied upon by appellant certainly does not. The writer of the opinion clearly differentiated it from *Cartwright v. Bamberger, Bloom & Co.,* and *Comer v. Heidelbach.* It is true that in *Warren v. Hunt* this court declined to declare a judgment obtained by confession, upon a mere allegation that it was confessed, fraudulent, as a judgment suf-

fered.  It did not appear, however, that the judgment creditor had knowledge or notice of the insolvency of his debtor, nor was there, as here, any averment in the bill, that the judgment creditor was actively aided by the insolvent debtor in securing the judgment after the suit had been brought.  All that was done by the judgment debtor was to accept service of the summons and complaint and consent to the rendition of the judgment against him.  All of this could have been accomplished without his consent or acquiescence.  In the case under consideration, the Bank could never have obtained its judgment first in point of time thereby securing the first lien, without the co-operation of the Supply Company in delaying the complainants in obtaining their judgments.

There was nothing in the conduct of the attorneys of the Bank in procuring the clerk of the circuit court to sign blank summons and complaints without informing him for what purpose they desired to use them, nor in filling them out in duplicate, and after doing so, delivering them to the sheriff instead of the clerk with instructions to serve the copy and return the original to them, and not deliver the original to the clerk, saying they did not wish it placed on the docket of the court, which violated any rule of law or professional ethics.  If this fact stood alone, the bill would confessedly be without equity.  It is the aggregation of the many facts in the bill showing collusion and the potent one showing the consentive assistance rendered by the Supply Company to the Bank in securing the first lien upon its property that gives the bill equity.

What we have said disposes of all the contentions insisted upon in argument of appellants' counsel.

A special prayer for relief must assentially depend upon the proper form and structure of the bill, and the court can grant such relief only as the case stated will justify.  A complainant can have no greater relief than the facts alleged in his bill warrant.—Story Eq. Pl., § 42.  The demurrer to a portion of the bill raises the sufficiency of its allegations as to a matter wholly immaterial and unnecessary to be alleged to give it equity.  We must, therefore, decline to reverse the decree of the lower court in overruling it.

The decree of the court must be affirmed.